## The Commonwealth *versus* Henry D. Maxwell.

A constitution is a plan or frame of government, which lays down certain great and fundamental principles, according to which the several departments it calls into existence, are to govern the people ; but all auxiliary rules which are necessary to give effect to these principles, must of necessity come from the legislature.

A law that is unconstitutional, is so, because it is either an assumption of power not legislative in its nature, or because it is inconsistent with some provision of the federal or state constitution.

The amendment to the constitution adopted in 1850, does not expressly require that an election to fill a vacancy in a judgeship shall take place at the *next* general election after the vacancy happens.

The Act of 27th April, 1852, which prescribes that such vacancy shall be filled by an election, at the next general election, which shall happen more than three calendar months after the vacancy occurs, does not conflict with the constitution, and is a valid and binding exercise of legislative power.

Such enactment restrains the right of election in no other wise than regulation is restraint.

Where a vacancy occurs within three months of a general election, and it is filled by appointment by the governor, such appointment can continue only to the first Monday of December, succeeding such *first* general election.

When a vacancy occurs again by the expiration of such appointment, the office may again be filled by appointment by the governor, to continue till the first Monday of December succeeding the *next* general election.

A law *intended* to take away, or *unnecessarily postpone* and embarrass the right of election, would be set aside as unconstitutional. But a provision prescribing three months for deliberation in the choice of a successor, in case of a vacancy, is a reasonable time, and based upon the analogies of the constitution.

Where a judge died on the 15th day of July, and the next general election thereafter occurred on the 14th day of October, *more* than three months had not intervened, whether the day of the death be included or excluded in the computation.

Conforming to the rule of excluding one of the days, *less* than three months had elapsed.

THIS was a *quo warranto*, in the name of the Commonwealth of Pennsylvania, *ex relatione* the Attorney-General, at the instance of John K. Findlay, Esq., against Henry D. Maxwell, Esq., to ascertain by what warrant or authority the defendant exercised the office of President Judge of the Courts of Common Pleas of the Third Judicial District, composed of the counties of Northampton and Lehigh.

The defendant appeared without process, and the parties agreed upon the facts to be considered as a special verdict, and which were substantially as follows :—

Judge McCartney died 15th July, 1856, leaving a vacancy in the office of President Judge of the Third Judicial District, composed of the counties of Northampton and Lehigh.

On the 21st July, 1856, Governor Pollock commissioned Henry D. Maxwell President Judge of said District, to hold the

[Commonwealth v. Maxwell.]

office until the first Monday of December, 1856, if he should so long behave himself well.

The sheriffs of Northampton and Lehigh counties issued and published their proclamations for the general election, enumerating the office of President Judge as one of the officers to be elected on the second Tuesday of October, 1856, being the fourteenth day of that month.

The general election came off on the 14th October, 1856, and John K. Findlay was elected President Judge, he having received 8638 votes, and no one else having received any votes.

The return judges made out and duly forwarded to the secretary of the Commonwealth and to the prothonotaries of Northampton and Lehigh counties, returns of the election, declaring Mr. Findlay to be duly elected, to serve for ten years, from the first Monday of December, 1856, if he should so long behave himself well.

The governor declined to commission him, and on the first day of December, 1856, commissioned Henry D. Maxwell to hold the office from that date till the first Monday of December, 1857, "unless the appointment and commission should be by him (the governor) or other lawful authority, superseded or annulled."

Judge Maxwell was sworn in under this commission, and claimed the right, lawfully to hold the said office under it, until the first Monday of December, 1857.

This proceeding was instituted to test the validity of this last-mentioned appointment, the relator claiming that it was unlawfully made; that Judge Findlay was duly elected, and that there was no vacancy to which the governor could commission Judge Maxwell.

The Attorney-General gave his consent to the proceeding, for the purpose of bringing the question before this court for decision, expressing his opinion that the commission had properly issued to Judge Maxwell.

The amendment to the constitution adopted in 1850, provided:

" The judges of the Supreme Court, of the several Courts of Common Pleas, and of such other courts of record as are or shall be established by law, shall be elected by the qualified electors of the Commonwealth, in the manner following, to wit: The judges of the Supreme Court by the qualified electors of the Commonwealth - at large: the president judges of the several Courts of Common Pleas and of such other courts of record, as are or shall be established by law, and all other judges required to be learned in the law by the qualified electors of the respective districts, over which they are to preside or act as judges."

It also contains the following clause :—" The first election shall take place at the general election of this Commonwealth next after the adoption of this amendment, and the commissions of all the judges who may then be in office, shall expire on the first

[Commonwealth *v.* Maxwell.]

Monday of December following, when the terms of the new judges shall commence."

Another part provided:—" Any vacancies happening by death, resignation, or otherwise, in any of the said courts, shall be filled by appointment by the governor, to continue till the first Monday of December succeeding the next general election."

The Act of 15th April, 1851, entitled "An Act to provide for the election of judges of the several courts of this Commonwealth," &c., enacted as follows:—

Sect. 11. "As soon as practicable after the first Tuesday in November following any election of judges, the governor shall grant the persons elected respectively, commissions, as now required by law, to hold their respective offices from and after the first Monday in December next following such election, for and during their respective terms of office, as prescribed and limited by the second section of the fifth article of the constitution of this Commonwealth."

The twelfth section of the same act provided, "That in the event of any vacancy occurring in any judgeship of this Commonwealth, by death, resignation, removal from office, the failure to elect, or otherwise, the governor shall appoint some suitable person to fill such vacancy until the first Monday in December following the next general election, and the qualified electors shall at the first general election, which shall happen more than three calendar months after the vacancy shall occur, elect in the manner hereinbefore provided, a suitable person to fill such office for the unexpired term, in the case of a judgeship of the Supreme Court, and for the full term of office in case of any other judgeship."

The Act of 27th April, 1852, provided:—" In the event of any vacancy occurring in any judgeship in this Commonwealth by death, resignation, removal from office, the failure to elect, or otherwise, the governor shall appoint some suitable person to fill such vacancy until the first Monday in December following the next general election, and the qualified electors shall, *at the first general election, which shall happen more than three calendar months after the vacancy shall occur*, elect in the manner provided by the Act of 15th of April, 1851, entitled 'An Act to provide for the election of judges of the several courts of this Commonwealth, and to regulate certain judicial districts,' a suitable person to fill such office for the full term authorized by the constitution of this Commonwealth, and so much of any law as is hereby altered or supplied, be, and the same is hereby repealed."

The relator contended that the commission under which Judge Maxwell was holding and exercising the office was illegal and invalid:—

1. Because three months had elapsed between the 15th July, 1856, the date of Judge McCartney's death, and the 14th Octo-

ber, 1856, the day on which the general election for that year was held.

2. Because that provision in the Act of 27th April, 1852, which restricts the right to fill a vacancy by an election to "the first general election which shall happen more than three calendar months after the vacancy shall occur," is in conflict with the constitution, and therefore of no binding authority.

*A. E. Brown* and *J. M. Porter*, for the relator.—Supposing the Act of Assembly to be valid, postponing the election for a year, when the vacancy had not occurred more than three months before the election—had not three months expired at the time of the election? The vacancy occurred the 15th July—the election was on 14th October; the three months expired with the 13th October. This being the case, the law knows no fractions of a day; and, the election opening by law at and after 8 o'clock, A. M., it was in law *more* than three months after the vacancy occurred. If one be born on the 1st February, he is of age to make a will of lands on the last day of January, twenty-one years thereafter, at one o'clock in the morning: per HOLT, C. J., Anonymous, 1 *Salk.* 44. Full age is twenty-one years, which is completed the day preceding birth: 1 *Chit. Black.* 463; 1 *Sid.* 162; 1 *Keb.* 589; *Ld. Ray.* 84.

*Lord Raymond* 480, Anonymous. "Action on a policy of insurance for insuring the life of Sir R. H., for one year from the day of the date. Policy dated 3d September, 1697, and Sir R. died 3d September, 1698, at one o'clock in the morning; held, per HOLT, C. J., *a die datus*, excludes the day of the date, but *a datu* or *a confectione* is from the act done, and so commences the same day that it is dated or delivered. And HOLT, C. J., cited a case where A. was born the 3d of September, and the 2d of September, twenty-one years thereafter, he made his will; and it was held a good will, because the court would not make a fraction of a day, and, consequently, being of the age of twenty-one years, he might devise his lands."

*Lord Raymond* 1096, Fitzhugh v. Pennington, per HOLT, C. J.: "The beginning and end of the thing is part of the thing; so if a man be born the 1st February and lived to the 31st January, twenty-one years after, and makes his will at five o'clock in the morning and dies by six at night, that will is good and the devisor is of age;" and the reporter refers to the last case cited in corroboration of this view, and also to 3 *Wilson* 274.

In Thomas v. Afflick, 4 *Harris* 14, it was held, where an Act of Assembly requires thirty days' notice to a justice of the peace, before an action can be brought against him, that, where the notice was served on the 19th May and suit brought 18th June, the thirty days had expired.

[Commonwealth *v.* Maxwell.]

The rule is well settled, that when you count from *an act done* or occurring, the day is included, but when you count from *the day of the date*, it is excluded. Thus, a lease to commence *a datu* includes the day of the date, but *a die datus* excludes the day: Haths *v.* Ash, 2 *Salk.* 413, referring to 5 *Co.* 1–94 b; 2 *Co.* 55; 2 *Buls.* 83–305; 3 *Id.* 203; *Aleyn* 77.

Here the time is to be counted from the vacancy occurring, which was on the 15th July, and therefore includes the day.

2. Could the legislature pass the Act of 27th April, 1852, declaring that an election to fill a vacancy shall be held at the first election which shall occur more than three calendar months after the vacancy happens, when the constitution has made no such provision? By its terms, the election is made the general rule—the appointment the exception. It is from necessity, and can only be exercised where such necessity exists. *Exceptio unius est exclusio alterius.*

At the time the amendment of 1850 was adopted, there was a general system in force as to notice of holding an election. The Act of 2d July, 1839, § 13, requires the sheriff to give notice by advertisement twenty days before the election, and to enumerate the officers to be elected, the place where the election is to be held, and who are elegible as officers of the election. The constitution, art. iii. § 1, prescribes the qualifications of electors.

Thus, the amendment having declared *all* judges shall be elected, the Act of 1839 prescribed the notice and the constitution the qualifications of electors, and the citizens having exercised the right and declared their choice of the relator, he is entitled to the place to which he has been elected.

The Acts of 1851 and 1852 were read, and it was alleged that their provisions were discordant with and repugnant to the constitution.

The legislature may pass laws to carry out constitutional provisions, but they cannot modify the constitution itself. Such legislation is void: Vanhorn's Lessee *v.* Dorrance, 2 *Dall.* 308; Stoddart *v.* Smith, 5 *Binn.* 355; Eakin *v.* Raub, 12 *S. & R.* 330; Commonwealth *v.* Mann, 5 *W. & S.* 418; Martin *v.* Bear, 10 *P. L. J* 457.

The case must be clear, it is conceded, to induce the court to declare an act of the legislature unconstitutional: Respub. *v.* Duquet, 3 *Y.* 493; Eaken *v.* Raub, *Sup.*; Commonwealth *v.* Zephon, 8 *W. & S.* 386.

The Supreme Court will, however, hold each of the three branches of the government to the performance of their respective legitimate duties, without encroaching upon and usurping the functions of co-ordinate branches: O'Connor *v.* Warner, 4 *W. & S.* 223; Norman *v.* Heist, 5 *W. & S.* 171; West Buffalo *v.* Walker Township, 8 *Barr* 177; Bolton *v.* Johns, 5 *Id.* 145; O'Brien

[Commonwealth *v.* Maxwell.]

*v.* Logan, 9 *Id.* 97.    These cases assert that the legislature cannot assume powers that belong to the judiciary.    *A fortiori,* they cannot confer upon the executive that which the constitution gives to the people.

No doubtful power should be exercised except from overwhelming necessity : 5 *W. & S.* 415.    And in Commonwealth *v.* Parker it was held that the people could not exercise the functions which the constitution had conferred upon the legislature.    Is it not equally true, that the legislature cannot take the power given them and vest it in the executive ?

The constitutional provision of 1850, as has been observed, is, that thenceforth, " the judges of the Supreme Court, of the several Courts of Common Pleas, &c., *shall be elected* by the qualified electors of the Commonwealth, &c.," again, " any vacancies happening by death, resignation, or otherwise, in any of the said courts, shall be filled by appointment by the governor, *to continue till the first Monday of December* succeeding *the next general election."*

Provision is thus made : First, for the election of judges by the people, in *all cases.*    Then, where inconvenience might occur from the delay of the election, a provision is made for a temporary appointment, *to continue until the first Monday of December* succeeding the *next* general election.

We look in vain for any authority to the governor to fill any *second vacancy ;* such a thing was not in the purview of the people when they adopted the amendment.    The case of candidates being equal in votes; of an election being illegal; of the successful candidate refusing to accept; and perhaps other cases of vacancy, are provided for by the words " or otherwise."

The constitution having provided that the appointment to be made by the governor, *shall only continue until the first Monday of December* succeeding *the next general election* after the vacancy happening, necessarily looks to that election for *permanently* filling the office.    It does not say that vacancies happening *within a given time,* shall be filled by appointment, to continue till the first Monday of December; but it says " *any vacancy happening."*

.    Taking, then, the provision that all judges shall be elected, &c., together with the restriction of the time persons shall hold appointments made to fill a vacancy, *the mind is irresistibly led to the conclusion that the vacancy is to be permanently filled at the next general election after the vacancy happens.* .

*If the legislature could defer the election to fill the vacancy for twelve months, they could defer it for two, three, or more years.*

The object of the people in adopting this amendment of 1850, would thus be altogether defeated, and the power that belongs to them would be transferred to the executive, the destruction of whose patronage seems to be the great object of the Convention of 1837–8, and the amendment of 1850.

[Commonwealth *v.* Maxwell.]

Even where a vacancy occurred on the bench of the Supreme Court of New York, within twenty days of the election, the Court of Appeals of that state held that the election conferred the office upon the candidate : People *v.* Edward P. Cowles; although the notice required was not given.

The first appointment of Judge Maxwell, it is conceded, was valid. But, at the expiration of that commission, the office was filled by an election, and the governor's refusal to commission Judge Findlay could not affect his right. The commission would be evidence of his right, but is not the only evidence. If his commission were necessary to him holding the office, this court could compel the governor by mandamus to sign and issue it.

If it be said that the Act of 1852 was a legitimate legislative act in carrying out the constitutional provision, we answer that the constitution confers no discretion on the legislature to nullify its provisions. It is not to receive a technical construction like a common law instrument or a *statute :* Commonwealth *v.* Clark, 7 *W. & S.* 133. Its commands as to time and manner are merely directory, unless it says the prescribed time and manner shall be pursued and no other.

A law will be unconstitutional where there is either an *express* prohibition or necessary implication: Commonwealth *v.* McWilliams, 1 *Jones* 70. It should be construed liberally in favour of the rights of the people : *Lieb. Hermen.* 188.

The constitution having only authorized the governor to appoint to fill one vacancy, where does he find authority to fill any other ?

It is to be observed that the governor's power must be derived from the constitution only. He can derive no power to appoint from the Act of Assembly.

*If the act gives him a power to appoint where the constitution does not, such authority is void, and the commission under it is void.*

*The Act of Assembly cannot create a vacancy in providing for filling a vacancy.*

The argument that this delay of twelve months was necessary to the execution of the constitutional provision, is altogether without foundation or authority.

The existing laws gave full notice of the election—afforded time enough for all to know of it—and thus the elective principle, the great object of the amendment, could be carried out.

The Act of 1852, like that of 1851, is in contravention of the principle, and would be a temporary repeal of the constitutional provision.

The commission issued to Judge Maxwell, December 1856, is unquestionably bad, for the reason that the governor in issuing it has assumed authority (to pass upon the validity of an election) nowhere delegated to him, but given to the legislature, and to be

[Commonwealth *v.* Maxwell.]

by them exercised only upon proper application and within a given time.

By the Act of 15th April, 1851, § 13, the election of any judge required to be learned in the law, is to be contested in the same manner provided for contesting the election for governor—that is, by the legislature, on petition of the qualified voters.   In this case there has been no complaint by any one.   If this is not done in the mode prescribed, the election, however irregular, would be conclusive upon the rights of all persons affected by it.   If the time elapses without such a contest, there would be no power anywhere to declare the election void.   Yet the governor, without waiting the proper time for this to be done, has assumed to declare an uncontested election void, and declared a vacancy for the purpose of filling it.   His proper course was to issue the commission, and allow the contest to go before the legislature, if any citizens wished to contest it.   The face of the returns was the only evidence he could require of the election.   He has not the right to interpose himself as a remonstrant against its regularity.

The only objection urged against the election is, that the three months required for notice of the vacancy had not elapsed.   But if the people of the district saw proper to waive a fraction of the time, no one has a right to object, unless he can show that he has been injured by it.   Who is injured here ?   Not the majority, for the election is their act.   Not the minority, for they offered no candidate.   Not the respondent, for the commission he then held was not in any way affected by the election, and he cannot change the controversy by taking a new commission afterwards.

The irregularity which will avoid an election should be of a flagrant character : Boileau's Case, 2 *Par.* 505.   This cannot be treated as such.

There was, therefore, no vacancy, " either by death, resignation, removal from office, the failure to elect, or otherwise," on which the commission could operate.   And therefore we pray for judgment of ouster.

*McCall* and *Casey*, for respondent, proceeding to argue the question of *time*, were stopped by the court, and directed to confine themselves to the other points raised.

There is an important distinction to be kept in view between the federal and a state constitution.   In the former, the legislature do not possess the power to act unless given; in the other, they have it, unless it is forbidden.   When an act of the state legislature is assailed as unconstitutional, the conflict with the primordial law must be pointed out, and be apparent, and this, although the enactment appears to trespass upon our notions of right reason or natural justice : Commonwealth *v.* McWilliams, 1 *Jones* 70 ;

[Commonwealth *v.* Maxwell.]

Same *v.* McCluskey, 2 *R.* 374; Harvey *v.* Thomas, 10 *Watts* 63; Lycoming *v.* Union, 3 *Harris* 169.

The infraction of the constitution must be clear and unequivocal: Respub. *v.* Duquet, 2 *Yeates* 501; Eakin *v.* Raub, 12 *S. & R.* 340; Commonwealth *v.* Zephon, 8 *W. & S.* 368.

The legislature may provide new tribunals, or new process for vindicating existing rights, and such enactments are within the limits of the constitution: Bank of Kentucky *v.* Schuylkill Bank, 1 *Par. Rep.* 223.

The same views and principles are reiterated and enforced in Sharpless *v.* The Mayor, 9 *Harris* 147; Railroad *v.* Casey, 2 *Casey* 287; Norris *v.* Clymer, 2 *Barr* 277.

Such being the clear and well settled doctrine of this court, it ramains to be seen whether, in the light of these cases, the Act of 1852 is in conflict with the constitution. In the clause of that instrument for supplying a vacant judgeship, there is no direction, either express or implied, that it shall be filled by an election, at the first general election after it occurs. The time of holding the first election under it is provided for alone. The elective principle is established, but the details as to time and manner, &c., are left to the discretion and wisdom of the legislature. In Com. *v.* Clark, 7 *W. & S.* 133, it is said that a constitution is not to receive a technical construction, like a common law instrument or a statute; and its commands, as to the time and manner of performing an act, are to be considered as merely directory. Human ingenuity and forecast would be utterly inadequate to provide for every exigency which might arise. There must be some power somewhere to regulate these as they occur. But it is alleged that there is a necessary implication that the election to fill a vacancy shall be at the first election which occurs after the vacancy happens, because the governor is only authorized to appoint until December succeeding that time. What is the inevitable consequence of this construction? That if a vacancy occur on the bench of this court the very day before the election, it must be filled the next— when not a thousandth part of the voters of the state would know of the vacancy, or be prepared to vote for a successor. For if it applies to a president of a district, it must equally to a Justice of this court.

The justice and convenience of the provision, in the absence of any direct denial in the constitution of the power to pass it, are strong arguments in favour of its constitutionality. For it is not to be presumed that the framers of the constitution intended to insert provisions which would be absurd or impracticable. The great importance of the office of a judge, and the length of tenure, are weighty reasons why full and ample time should be afforded for selections.

It is said, however, by the relator's counsel, that it is not con-

tended, where the vacancy should occur the day before or within a few days, that the election should and must be held at all events. This we submit yields the whole case. If it does not require it, in every case of a vacancy, where is the line of distinction to be drawn? How *many* days before must the vacancy occur to require an election, and how *few* to dispense with it? Is there any thing in the constitution by which these questions can be answered? If it is not provided for in any way, why may not the legislature regulate it?

The argument, that this provision had some reference to the 20 days fixed for notice of the election by the Act of 1839, is equally unfortunate and untenable. That was a mere legislative provision, subject to change, modification, or repeal, and of course when either occurs, the time must change with it. This, so far as the election of judges is concerned, was accomplished by the Act of 1852, when it extended that time to three calendar months. The time, moreover, is in analogy to that fixed in the constitution for a vacancy in the office of governor.

The case of The People v. Cowles, cited on the other side, is founded upon the express and peremptory words of the New York constitution, nothing approximating in any degree to which is found in our own. That provision is as follows:—

"In case the office of any judge of the Court of Appeals, or any justice of the Supreme Court, shall become vacant before the expiration of the regular term for which he was elected, the vacancy may be filled by appointment by the governor, *until it shall be supplied at the next general election, when it shall be filled by election for the residue of the unexpired term.*"

Notwithstanding this very strong mandatory language, it was with some hesitation that the courts of that state decided that the election to fill the vacancy must be at the first election, where that occurred fifteen days after the death of a justice of the Supreme Court.

Under our constitution of 1838, prothonotaries, &c., are to be elected and commissioned by the governor. The legislature directed that the commissions should not issue for thirty days after the election, and their terms commence on the first Monday of December succeeding the election. By express terms, "all officers whose election or appointment is not provided for in this constitution, shall be elected or appointed as *shall be directed by law.*" The time and mode of electing judges is not provided for in it, and the legislature have not only authority to prescribe them, but it was their express duty to do so.

If the Act of 1852 is constitutional, the election of the relator was a nullity; and Judge Maxwell's first commission expiring, there was a vacancy. Why could not the governor fill it? The constitution authorizes him to fill any vacancies happening by

[Commonwealth *v.* Maxwell.]

death, resignation, or otherwise. These would cover every vacancy that could possibly occur in any way. But the relator contends that he can only fill *one* vacancy. Suppose the judge elect dies before induction into office—refuses to lift his commission, or accept the office—or is ineligible—is the office to remain vacant for a year? Surely, the framers never intended such consequences as the relator's counsel would have flow from that instrument.

But, it is said, the election was held, and whether regular or irregular, the governor could not declare it void, unless pronounced so on a contest, in the mode prescribed by law, by a committee of the legislature. That, although the statute has forbidden the election, the people could disregard it, and it could only be set aside by the legislature; and, in the absence of complaint, that would become lawful which was before illegal. Such a doctrine is subversive of all social order and government. It repeals a statute by the consent of citizens to its infraction. This is practical nullification of the worst kind. This is not the case of a legal election illegally held, but of one held without authority. *It is not the regularity of the election, but the right to hold it at all,* that is disputed. It does not, therefore, come within the province of the legislature, but of the courts to decide it. For the legislature possesses no judicial power, as is ruled in DeChastelleux *v.* Fairchild, 3 *Harris* 18, Ervine's Appeal, 4 *Id.* 265; much less could they be invested with power to decide the constitutionality of a law passed by their predecessors.

The whole scope of the Act of 2d July, 1839, shows that it was intended to ascertain whether, at an election at which the officer could be legally elected, the election was legally conducted, the returns properly made, and the person returned had the highest number of legal votes. "It hath this extent; no more."

The opinion of the court was delivered by

WOODWARD, J.—Judge McCartney died on the 15th July, 1856, and the general election for that year was held on the 14th day of October. The Act of Assembly of 27th April, 1852, in respect to vacancies in judicial offices, provides that the qualified electors shall choose a successor "*at the first general election which shall happen more than three calender months after the vacancy shall occur.*" A large majority of the qualified electors of the third judicial district, the rest declining to vote, elected the relator, on the 14th of October, to be their president judge, in the place of Judge McCartney.

Had they the right of election on that day?

This is the general question presented by the case stated. If they had the right, they exercised it in the forms of law; the relator was duly chosen, and on the first Monday of December no

[Commonwealth *v.* Maxwell.]

vacancy existed to be filled by executive appointment, and the respondent's commission is void. If they had not the right, the election, though in due form, was naught; the office was vacant on the first Monday of December, and the respondent was well appointed.

It cannot be maintained that the right of election existed under the statute, for, according to the Pennsylvania fashion of computing time, more than three calendar months did not intervene between the happening of the vacancy and the election. This court said, in Thomas *v.* Afflick, 4 *Harris* 14, in speaking of statute time, that the rule is to include the first day and exclude the last. But here, if we include both days, that of Judge McCartney's death, and that of Judge Findlay's election, we do not make *more* than three months, which is what the statute demands. Conforming to the rule, and excluding one of the days, we make *less* than three calendar months, so that it is too plain for discussion, if the statute is to be followed there was no right of election on the 14th of October.

But it is said the constitution confers the right, and that the Act of Assembly, in so far as it postpones or abridges it, is unconstitutional. This raises an important question, to which we have given the earnest consideration which is always due to doubts of the constitutionality of legislation; especially when supported by the opinions and arguments of counsel of great experience and learning. With a strong desire to come to a common judgment on the point, we have found ourselves unable to attain to it. My duty is to express the opinion of a majority of the bench.

The Act of Assembly of 27th April, 1852, the validity of which is to be tested, is in these words: "In the event of any vacancy occurring in any judgeship in this Commonwealth, by death, resignation, removal from office, the failure to elect, or otherwise, the governor shall appoint some suitable person to fill such vacancy, until the first Monday in December following the next general election, and the qualified electors shall, at *the first general election which shall happen more than three calendar months after the vacancy shall occur*, elect in the manner provided by the Act of the 15th of April, 1851, entitled 'An Act to provide for the election of judges of the several courts of this Commonwealth, and to regulate certain judicial districts,' a suitable person to fill such office for the full term authorized by the constitution of this Commonwealth, and so much of any law as is hereby altered or supplied, be, and the same is hereby repealed."

The Act of 15th April, 1851, to which the above section is supplemental, was passed to regulate the election of judges, but the 12th section being found inconsistent with the constitution, in requiring judges of the Supreme Court in case of vacancy to be elected for the unexpired instead of the full term, it was replaced

[Commonwealth *v.* Maxwell.]

by the above Act of 1852, which was intended to be, and now forms, part of the existing system for the election of judges.

A law that is unconstitutional, is so because it is either an assumption of power not legislative in its nature, or because it is inconsistent with some provision of the federal or state constitution.

That the Act of 1852, in its general scope, is of the nature of legislative power, may be inferred from several considerations. It prescribes a rule of action for the people whereby they may exercise a constitutional right. A constitution cannot execute itself. It is a frame or plan of government. It lays down certain great and fundamental principles, according to which the several departments it calls into existence are to govern the people; but all auxiliary rules which are necessary to give effect to these principles must, from the necessity of the case, come from the legislature. Indeed, it is for this very purpose the constitution establishes a legislature. Accordingly, when the convention of 1838 determined that aldermen and justices of the peace should be elected, they enjoined, in the schedule, that the *legislature* should provide for the first and all subsequent similar elections. Another clause of the schedule enjoined that such laws as should be required by the 8th section of the sixth article of the amended constitution should be enacted by the *first* legislature under the amended constitution; but in the Commonwealth *v.* Clark, 7 *W. & S.* 127, it was held that the Act of 1843, authorizing the election of canal commissioners, was constitutional, though it was not passed by the *first* legislature that sat under the amended constitution. This shows that, both in the judgment of the constitution and of this court, such regulations for carrying out constitutional principles are essentially legislative duties, even when the particular legislature enjoined to perform the duty has neglected it.

We may safely conclude, therefore, without more, that when the legislatures of 1851 and 1852 undertook to regulate the election of judges, which the constitutional amendment of 1850 for the first time prescribed as a principle of government, they assumed no unwonted or unwarranted jurisdiction. Their *action* in the premises may have offended the constitution, but the *premises* were clearly conceded to them by the constitution.

It is not suggested that they violated any provision of the federal constitution, and the only question that remains is, what provision of the constitution of Pennsylvania did they infract?

It is answered, the amendment of 1850. And in this, that the constitutional amendment requires vacancies in judicial offices to be filled at the *next general election after they happen;* whilst the Act of Assembly forbids them to be filled at the next general

election, *unless* more than than three months elapse between the happening of the vacancy and the election.

It is a mistake to suppose that the amendment expressly enjoins any election whatever to fill vacancies in the judicial office. A careful reading of it will show that the only express provision for vacancies, happening from whatever cause, was that they should be filled by executive appointment; and that the right of election to fill vacancies, rests only in inference and implication. Let us see if this be not so.

The amendment begins by providing for the election of judges, those of the Supreme Court by the electors of the commonwealth at large, presidents and all judges required to be learned in the law, by the qualified electors of the respective districts over which they are to preside, and the associate judges of the Common Pleas by the electors of the counties respectively. It then goes on to re-enact the limited tenures of the judges, in the same terms in which that subject was provided for by the second section of the fifth article of the amended constitution of 1838. The first election of judges under this amendment, the dates of their commissions, and the classification of the judges of the Supreme Court, are next provided for; and then follows the only clause relative to vacancies, in these words : " *Any vacancies happening by death, resignation, or otherwise, in any of the said courts shall be filled by appointment by the governor, to continue till the first Monday of December succeeding the next general election.*"

There is the provision—the whole, the only provision which this amended article makes for filling vacancies—and it is by executive appointment, and not by popular election. There is a limitation on the power of appointment—to the first Monday of December succeeding the next general election; but when that limit expires a vacancy exists again, if not by death or resignation, by expiration of the judicial commission; and this, like all other causes of vacancy, is covered by the comprehensive words, " *or otherwise,*" and, according to the letter of the amendment, is to be filled again by executive appointment until the first Monday of December succeeding the *next* general election. The respondent was appointed and recommissioned in literal fulfilment of these constitutional words.

When, therefore, the act under consideration is said to conflict with this constitutional amendment, it cannot be meant that it violates any words or phrases that enjoin an election of judges to fill vacancies, for such words are not in the amendment.

But, from the general provision for the election of judges, and the whole scope, tendency, and object of the amendment, and especially from the limitation on the appointing power, we deduce an implication or inference that the penman meant that the vacancy should be filled by election at the next general election. I am

[Commonwealth *v.* Maxwell.]

willing to accept this as the very idea in his mind. I think it is the sound construction of the instrument. Still it is only an implication, and I doubt if any Act of Assembly has ever been annulled for contravening an implied rule of the constitution. We are in the habit of saying, and our predecessors said it with great emphasis, that it must be a clear case to justify the judiciary in setting aside an Act of Assembly as unconstitutional. In the last constitutional question in this court, it was said, nothing but a *direct* collision between the provisions of the statute and those of the federal or state constitution will have this effect: 2 *Casey* 301. What is meant by such expressions? that the judiciary may set up their implications as of equal force with the letter of the organic law? Or, that the law must be in such plain conflict with the letter of the constitution as to be apparent to every reasonable mind when pointed out? If the former be meant, no man can tell what the constitution is from what is written, and we might as well not have a written constitution; if the latter, then this is not a clear case of *direct* conflict.

It was not clear to a large body of electors in the third district, who declined to vote on the ground that they had not the right to elect; the record shows it was not clear to the governor and attorney-general; and it is not clear to us. I should, perhaps, rather say that it was clear to the governor and attorney-general that the act was constitutional. No man can take the law in one hand and the constitution in the other, and say that their *terms* clash. Whether the law conflicts with the *spirit* and *meaning* of the constitution, depends on what we declare them to be; and, if we set up inferences which are inconsistent with the law, let it be said that the law conflicts with the judicial implications derived from the constitution, rather than with the instrument itself.

I do not say that Acts of Assembly may not be set aside on this ground; but they have not been, heretofore; and yet this is the only ground on which the act in question can be impeached.

Not, however, to insist further on this point, let it be granted that the constitution is to be accepted according to its judicial interpretation; and that the meaning of the instrument is that judicial vacancies are to be filled by elections. What then? The rule is a general one, prescribed, like most other constitutional rules, as a great first principle of government, to be regulated and applied by the legislature. The constitution does not attempt to apply its own principles. It lays down the principles that elections shall be free and equal, and that the right of trial by jury shall remain inviolate, but leaves the legislature to regulate elections and trial by jury according to a sound discretion. In like manner, it says judges shall be elected; and it does indeed fix the day of the general elections, and voting by ballot, but it does not say

what notice the electors shall have of the vacancies to be filled, where they shall vote, who shall receive and count their votes, nor how the result is to be certified to the governor; all which is necessary to make an orderly and fair election. Standing alone, the constitution could not effect the desired reform. It decreed the election of judges, but referred the mode to the law-making power. To secure to the people the constitutional right of election, it is necessary for the legislature to step in and arrange those details without which the general principle would be mere *brutum fulmen.*

The counsel for the relator felt this so sensibly that they were driven to the argument that the election laws existing at the adoption of the amendment were intended to furnish the regulations necessary for carrying the constitutional principle into effect. These laws, among other things, prescribed twenty days' notice by sheriffs' proclamations of the offices to be filled, and of the places to which the electors should repair to deposit their ballots. It *is* extremely probable that the legislature and the people, in adopting the amendment, referred themselves to these laws; and, suppose they did, one of two things must then be true: Either these laws were impliedly taken up and incorporated into the constitution, and became thereby part of the fundamental law, or else they remained mere laws, alterable and repealable at the will of the legislature. Nobody will contend for the first alternative, and the latter becomes the inevitable conclusion. But, if the legislature may prescribe *twenty* days' notice of the vacancy to be filled, why may they not repeal that and prescribe *ninety* days? And, on what principle is this court to proceed in declaring the latter law unconstitutional which would not be equally fatal to the former? If we insist on reading the amendment as an inflexible and imperative rule that vacancies shall be filled at the *next* general election after they happen, without regard to time or notice, then the election laws in force at the adoption of the amendment are no better than the Act of 1852, for a vacancy may happen within twenty days before a general election as well as three months. Both must be swept away, and we must come down to the rule that vacancies, occur when they may, shall be filled at the next general election; and that rule, I submit, would be impossible of execution in many cases. The electors of the state, the district, and the county are to choose the judge; but the right of choice cannot be exercised until it is known there is a vacancy to fill, nor until time is given to cast about for a fit incumbent and to canvass his qualifications. And how is a vacancy which happens the day before a general election to be notified to the electors? If it were a vacancy on the supreme bench, or in the presidency of some of our large judicial districts, not one-half of the electors would hear of it; and, if they did, they would not be ready the next day to make

[Commonwealth *v.* Maxwell.]

discreet choice of a successor. To compel them to choose at the *next* general election in such a case, and in many cases that might be supposed, would be to sacrifice the right. A judge might resign the night before an election, and the few friends to whom alone it was known go next day and re-elect him or any other, even the most incompetent or objectionable man, to fill the vacancy—which would be a mockery of the right of popular election. Cases of the grossest imposition, such as would shock the common sense of mankind, would certainly occur, under the operation of the rigid rule which is attempted to be forced on the constitution. The elective principle, instead of being, as it was intended to be, a concession to popular sovereignty, would become an intolerable evil; and an oppressed people would be more anxious to get rid of it than they were to plant it in the constitution.

To avert painful consequences, and to make sure of the reform designed, we have only to consider the constitution as furnishing the *principle* of government, instead of the *rule* of action. It prescribes popular elections, and leaves the legislature to regulate them. The error springs from the attempt to deduce, not only the *principle* but the *rule of its application*, from the constitution. "A constitution," said Judge GIBSON, in Commonwealth *v.* Clark, "is not to receive a technical construction, like a common law instrument or a statute. It is to be interpreted so as to carry out the great principles of the government, not to defeat them; and to that end, its commands as to the time or manner of performing an act are to be considered as merely directory, wherever it is not said that the act shall be performed at the time or in the manner prescribed, and no other." So far from saying that vacancies shall be filled by election at the next general election, and in *no other manner*, the amendment, as we have seen, does not even say that they shall be filled by election at all. When, therefore, we construct a rule by implication, of such rigour and inflexibility as to defeat the legislative regulations, we not only violate accepted principles of interpretation, but we destroy the very right which the constitution intended to guard.

If it be said that extreme cases are not to be imagined to test the soundness of a rule of construction, I reply that it is not an extreme or improbable supposition that vacancies will occur so short a time before a general election as to preclude the notice, and the canvass, which are essential to the right of choice. And it is such cases that illustrate the necessity for the legislation which is complained of. If, in any view that can be fairly taken of the subject, the statute is agreeable to the constitution, we are bound to sustain it.

It is of no avail to argue that the people of the third district made a fitting selection without authority of law. Their success may be due to the fact that they lacked but one day of a strict

[Commonwealth *v.* Maxwell.]

compliance with the statutory rule, and if so, it is an argument in favour of maintaining rather than prostrating the rule. But it is a general rule that the statute prescribes, and if it is salutary, regarded as a *general* rule, it is worthy of the sacrifice, which, in this instance is reluctantly made to it. Next time it may prevent wrong and outrage, and that it may be useful when it is needed, it must be enforced now. It is no reason against a rule so obviously favourable to good order and well selected judges, that it operates hardly in a case peculiarly conditioned like the present.

But it is said the statute restrains the right of election for three months. No otherwise than regulation is restraint. All system implies some restraint. A mode prescribed excludes all other modes. And if the right to regulate the election of judges be conceded to the legislature, it is no objection to their rule that it is precise, practical, and exclusive.

If the legislature should pass a law plainly intended to take away from the people the right to choose their judges—or even a law which unnecessarily postponed and embarrassed the right, it would, doubtless, be set aside as unconstitutional; but this law can not, with any show of justice, be so characterized. The constitution prescribes an election, without defining it; the law defines the conditions under which that election shall take place, and because they are not unreasonable conditions, but such as are favourable to a deliberate and cautious performance of the duty—such, in fine, as are calculated to make the election what the constitution meant it should be—it would be a gross misapprehension to confound this act with a legislative attempt to repeal the constitution.

The time fixed may be longer than is necessary for the selection of an associate judge, and longer than was indispensable to a judicious choice in the third district, but it is not too long for the choice of a judge of the Supreme Court, or of a president judge in those judicial districts which consist of several counties, and where population is, comparatively, sparse. It is the very period which the constitution itself fixes for the selection of a governor to fill a vacancy, and was doubtless adopted in analogy to that. And is not the selection of a supreme judge for fifteen years, or of president judges for ten years, as important a duty—worthy of as much care and circumspection—as the selection of a governor for three years? The people have a deeper stake in the judicial office than in any other, and seeing that they have secured to themselves in their constitution three months, as a reasonable time to canvass for a governor, it would be a curious discovery in constitutional law that the same period fixed by the legislature for choosing a judge was so palpable a violation of the constitution as to make it our duty to arrest the operation of the enactment.

To say that no interval for information and inquiry shall be

[Commonwealth *v.* Maxwell.]

allowed, would often defeat the right,—to concede the necessity of an interval to a proper exercise of the right, is to concede the legislative discretion, and so long as that is not abused there is no occasion for the interposition of the judicial arm.

This Act of Assembly is not unprecedented. I have said it forms part of the legislative system begun in 1851 to regulate and give effect to the constitutional principle of an elective judiciary. It is founded on the same principle as all those laws which regulate trial by jury, *habeas corpus*, education, and other constitutional rights, and is in strict analogy with the several statutes which were made necessary by the amendments of 1838. The Judiciary Act of the United States is a striking instance of legislation in furtherance of constitutional principles, and of the large discretion which legislative bodies exercise in discharging such duties. Other instances are noticed by Judge GIBSON, in the case already referred to, of Commonwealth *v.* Clark, and, let it be remarked, the legislation in question there bore the appearance of a much more direct conflict with the constitution than this Act of 1852.

Standing well on precedent then, sustained by sound considerations of public convenience, and opposed to no provision of the constitution, express or implied, our duty is plain to give it effect.

We have seen that under it the electors of the third district had no right to choose a judge on the day they elected the relator, and therefore we conclude he has shown no title to the office he claims.

> And now, to wit, the 19th day of January, A. D. 1857, this cause having been fully argued by counsel, and considered by the court, judgment is here entered for the respondent in the case stated.

LEWIS, C. J., and BLACK, J., dissented.